Daniel Hoefstetler. Good morning.  May I please reserve two minutes for rebuttal? Yes. Thank you, Your Honor. My name is Joshua Solomon and I represent appellant Daniel Hoefstetler. This case involves government agents' repeated use of threats to and inducements concerning Mr. Hoefstetler's loved ones, including children, as a means of obtaining from Mr. Hoefstetler a self-incriminating statement, which was then used against him at trial over his objection for a motion to suppress. The parties agree that once Mr. Hoefstetler challenged the voluntariness of that statement through his motion to suppress, the government had the burden of demonstrating by a preponderance of the evidence that the statement was entirely voluntary and that it must do so in light of the totality of the circumstances. Here, the totality of the circumstances really come down to the interrogation that took place over the course of a little over two hours that led to the self-incriminating statement. It's a, it's a, it, that, that interrogation was, was both recorded and for full review and seeing how that interrogation proceeded and the extent to which the special agent of the FBI and the local police officers used Mr. Hoefstetler's pregnant girlfriend's incarceration and the situation her two children were left in is important to, to resolving the coerciveness of, of, of the tactics they used and the reason that Mr. Hoefstetler ultimately confessed in the face of that coercion. We, we, we provided the court with some fairly extensive excerpts from that, that interrogation so that the court can see how that played out. But by way of summary for, for, for these purposes, the FBI agent and the police officers began by blaming Mr. Hoefstetler for the situation that his, his girlfriend, six months pregnant with his, his child and her two minor daughters, ages seven and 13, left at home without either Mr. Hoefstetler, who lived with them and helped care for them, or their mother, who was also being incarcerated, the, the agents began by blaming him for that situation, telling him that it was his fault and that he needed to step up to solve the problem. You, you can certainly continue, but I just want to tell you the flavor that I got from reviewing the interview was that what they were trying to say to him was, if the, if your girlfriend wasn't involved, you need to tell us because that's going to be important. And what's wrong with that? I, I think they went well beyond that, Your Honor, respectfully. I, I think they used such language as, you should feel like a real heel right now because you put her in this situation and what you need to do to solve this problem that you created was say, is say to us, this, this is something that I did, I have responsibility for this, I used her, I didn't tell her what I was doing, and, and therefore you should put this on me. But didn't they several times say, if that's, if that's the truth, we don't want you to lie. If she was involved, we would like you to tell us. They, they, they did say, they did say several times that we don't want you to tell us something that's, that's not true, but, but whether or not what he then goes on to say is true doesn't matter for the question of whether it's voluntary that he, that he actually stepped up and, and confessed. So that's the part of your argument that I don't understand. Because this court, this court has said, I think most recently in, in U.S. against Jackson, the Supreme Court has said in Jackson v. Jackson, it doesn't matter whether the confession is truthful. Because it doesn't matter whether the, the, the defendant actually committed the crime. It doesn't matter whether there's sufficient evidence outside of the confession that the defendant committed the crime. If the statement is not voluntary, if it was coerced, if, if his will was overborne by what the, what the officers did, and then that statement is used over his objection, then the conviction cannot stand. It, it, there's no, there's no, there's no harmless error analysis. There's no, no looking at what the other evidence was. There's no looking at whether the confession was actually true, because it doesn't matter if it's true. The, the, the Fifth Amendment principles against coerced self-incrimination and due process, the case law treats it as, as, as, as, as both issues, both a due process issue and a, and a self-incrimination issue, those principles are so important that we will not allow involuntary coerced confessions to be used against the defendant at trial, regardless of what the evidence is. I thought from the cases that the, the way we're supposed to decide whether the will was overborne was not by looking only at the statements of the investigators, but by looking at the dynamic between the two, because otherwise in Tingle, there's no reason for the court to be focused on the reaction of the woman who made the confession and her sense that she was overwhelmed by it, and we're not, we don't look, otherwise we wouldn't look at the sophistication of the defendant, their experience in the criminal justice system, which the cases make relevant. And if you look at the dynamic here, what about the dynamic suggests, even if there were a few statements that could have led someone to have their will overborne, what from this dynamic dialogue between the two suggests that in fact, his will was overborne? You're absolutely right, Judge Byron, you do look at the totality of the circumstances, not just what the, what the officers, officers said. I do want to say it wasn't just a few statements. There were almost two dozen times where the, where the officers said, you need to take this on yourself, you need to confess in order to help them. So it was, it was consistent throughout the entire period. Is that the exact language, you need to confess to help them? I'm not, I'm not, I'm not quoting, I'm giving the sense of what they were telling him. They, they, they actually were more specific than that. They said, you need to say that I did this. You need to say that, that I used her to do it, but that she didn't know. I thought they said, if you say this, consequences will follow. It was both. They, they, they put it in both terms. I mean, they, they. So conceding that, what it shows that his will was overborne when he says things like, this is, let's have, it's D-Day, let's go at it, or this is kind of fun. He just doesn't sound like a person whose will is being overborne by these questions. He certainly made some strange comments like that throughout. And, and. Well, they're not strange. They, if you think that they just suggest he was in control of the conversation. Well, but, but the reason we know he wasn't in control of the conversation was, first of all, the agents were the ones that brought up this, this notion of helping her by him confessing. He expressed concern about her at first. He said, where's my girlfriend? What, what's going on with her? And they then, then jumped on that as, as seeing something that they could use against him, and then they brought up the, the, the, the point about a, some type of exchange of his confession for better treatment for her. It wasn't his idea, as the government seemed to argue in their brief. But he continually resisted. He began by being unwilling to confess. In fact, expressing over and over again, I think six times, and we quote them in our, in our brief, a, a lack of understanding of how he, his actual confessing could help her. They would say, they would say, you need to step up. You need, you need to make this right. And he would say, I don't get that. You've already arrested her. You've already decided that, that she's, that, that, that she's responsible for this, so how could I really help her? I don't understand what you're saying. And they said to him, you're not paying attention. You're not hearing what we're saying. You can help her if you confess. They convinced him that if he confessed, that it would, it would, it would help her situation, would help the, the children's situation. And it would, right? It, it, it, it presumably could have. It doesn't matter whether, whether. So why couldn't we just read it as he had a two hour long negotiation with them when he got confident that him saying something really would be used in a way that might be helpful, he was willing to say it. But, but his, his, he came into the, he came into the interview, to the unwilling to confess. He was, he was clear about that. It took almost two hours before he, he changed his mind. And, and it clearly wasn't his idea. It wasn't something he was trying to put forth to the, to the government. They brought it up. He expressed a lack of understanding over and over again about how he could actually, how they could actually benefit from them. And it was only after they incessantly used it over and over again, almost two dozen times, and at the very end, when he said, look, all I care about is I want her to be released, how does she physically get out of here? And the, and the government's answer to this is telling. The government's answer was, you need to tell us what happened. And then elaborated with the, the, the line I've, I've, I've said several times now, tell us that it was you, tell us that she didn't know, and so forth. I, I, I see a lot of time. I don't know if I answered your honest question. You've reserved some time. Thank you. Good morning. Seth Afrin for the United States. I think Judge Barron, you've set the legal framework correctly, which is the voluntariness aspect is looked at from both sides. So it's the police conduct on one side, the response of the defendant to that conduct on the other side, with the ultimate question being, was the defendant will overborne such that we can then say that this was a voluntary confession? In your brief, you spend a fair amount of time making the point, making the points that the officers did not promise him anything, that they were not, they could not fairly promise him. They did say they could talk to the judge and the prosecutor, and that might, that might help his girlfriend. And that's all true. You point that out. And they didn't, you know, they didn't, they didn't, they didn't lie to him in any way. We do see cases where the officers engage in some duplicity. There's none of that here. My question is, why do you focus so much on a lack of promises, a lack of receipt, when arguably that really has nothing to do with voluntariness? I mean, how important is that to the issue of voluntariness? I mean, you could have situations where there are lies, there are promises that perhaps should not be made, but you could still find that the statements that followed were, were voluntary. Isn't that true? Yeah. So, but I mean, our cases certainly talk about huge jacks, several of the first circuit cases talk about, and there are Supreme Court cases, older ones that say an inducement or a promise can be a factor in the voluntariness calculus. And as I read the defendant's brief, the suggestion was made that there was either a threat or a promise, which is really, in my mind, sort of two sides of a coin, about that they were inducing him and overbearing his will by threatening or promising related to the girlfriend. And I took that to be the theme of the brief. So the theme of my brief, I thought, was that there was no promise, that this was the truth. The truth was he was in a difficult situation. His girlfriend had admitted that she had driven the getaway car. They had justifiably arrested her for probable cause. He has been arrested for the robbery. And now he's in a situation where they're suggesting that he, he initiates the conversation with the girlfriend and says, where's the girlfriend? What is the status of the girlfriend? And as the conversation unwinds, it becomes clear that they're telling him the truth. You can help the girlfriend. If the facts really are that you asked her to drive you and didn't know where you were, where she was, she didn't know what you were going to do, then that would be very important. But that's information that's really between you and her. We have no way to know that. What we know is she drove the getaway car. So my point was they confronted him with the truth. That truth created a difficult situation for him. There's no question. Help my girlfriend on the one hand, but if I do, I may have to give myself up. And that's a problem for him. And my point was, that's a problem, but that's not coercive. I mean, that's the theme that I was trying to strike and why I focused on the lack of a promise as opposed to the presenting of the real situation that this person was in. And that's why I cited two cases from other circuits that talked about this problem and said, so long as when you say you're going to give a benefit to the loved one, but it's a real benefit you can give because there really was probable cause to arrest them, that's not coercive police conduct, which is a necessary component to have a successful voluntariness claim. So that is how I thought of the brief, but I also thought of the brief in the cases that Judge Barron was talking about, which is how did the defendant react? I thought it was very telling when twice he says, don't hurry this up. It's better here than down there. He enjoyed the repartee with Special Agent Hanlon and the officers. It's more fun to do this than sit alone in my jail cell. I don't want to hurry this up. And when he did want, if you go back, I suggest to you that as you consider this video, because I think that's telling, throughout the part where there's the discussion of the girlfriend, his answers are slow and somewhat meandering, and then when he decides I'm ready to confess, and you can sort of see it in the transcript, larger, longer paragraphs, and if you listen to it, you'll hear a more rapid speech, okay, I've done what I wanted to do here, I extended this as long as I could, I was even sophisticated enough to not only get as much as I could, but I was also encouraged to talk about not investigating me further, and once I did that, I confessed. That to me is strong evidence that the defendant was in control of this conversation. He knew the issues that he wanted to raise, and he raised them throughout the 80 pages of transcript. What is the, seems like perhaps an obvious question, but I'm not sure the answer is that obvious. What is the underlying concern with voluntariness? Is it a sort of a due process concern? We're offended by the notion that someone might be coerced into making a statement that is contrary to their free will, or is, are we concerned about the reliability of the statement that ensued? What, what? I don't think those are, I think we're concerned with both, because I mean, this came from the idea that we're going to, you know, the police are going to beat up or deprive someone of food, and to get out of that situation, they will say what they need to say to get whatever the harm that's being inflicted upon them released. Well, that does create a reliability problem, obviously, because you would do what you need to do to get out of that situation, it being sufficiently egregious. And is it fair then to use that against someone in a due process sense? No, it's not. So, so that's the, that's the origin of the voluntariness concern. On the other hand, police are allowed to, even as I think you suggested, deception is not always improper. There's a line, and as Judge Selye said in a recent case, you know, it's an archaeological dig of the facts, looking at both sides of this. How rough or improper or inappropriate were the police on the one hand? And what did that matter to the defendant on the other? People have different sort of abilities to withstand. I think this defendant showed a relatively strong ability to withstand, where right down to the end, he was negotiating for more what he perceived to be concessions. Whether you think they were or not, I think is a different question, but that's what I think he perceived himself to be doing. He tried to show his legal acumen throughout the discussion, talking about debating what's conspiracy, what are people's constitutional rights. This is all evidence that he knew what he was doing and that his will wasn't overborne. And the fact that there was discussion of the girlfriend, which was an issue raised by the defendant, or that there were discussion of the children in the sense that it's sort of an obvious fact that if she's in jail, she's not going to be with the children. I mean, it doesn't, that wasn't, that didn't appear as entangled or brown to cause some kind of emotional outburst from, oh my goodness, I'm never going to see the children again. I mean, that doesn't happen. This is more like the interview was with the boyfriend in Tingle rather than with the girlfriend. Correct. So, right. I mean, in Tingle, it's, you will not see your child if you do not confess. I, the police officer, will make sure you stay in jail and you are not going to see that officer. And in Brown, it was, if you don't confess, I'm not, if you do confess, I will help you go see your unborn child be born. Those things really go to the reliability concern that I think is, you know, that that's something someone might say something that isn't true to get that benefit of going to see their unborn child be born. So I think the cases are distinguishable in that way. I think the cases that I cited are more on point, and some are even more egregious. Thompson, for example, the statement by the police officer allegedly was, your girlfriend who is legitimately arrested for murder will get the death penalty along with you if you don't confess. If you do, we'll let, you know, she will go. The 11th circuit said that that was not a problem because that was a potential penalty. She was legitimately arrested for murder. And so that was the situation they were in. And to present that to the defendant did not create a constitutional problem. I think that case is far, in my mind, on the closer side than this one. If there are no further questions, I'm content to rest on the brief. Thank you. I want to go back to something that the government just stated and also a question that Judge Barron answered about whether this could really just be seen as trying to get information from a witness because they're also investigating the girlfriend. I think that way of reading the transcript is inconsistent with statements such as this one from Special Agent Hanlon because a man who cared about his girlfriend would sit here and say, yes, agent and detective, I robbed the bank. But my girlfriend, even though she drove me over there, had no knowledge I was going to rob the bank. What do you say to the government's argument on those statements by Agent Hanlon which they seem to suggest if the whole dialogue consisted of that type of talk, maybe it'd be a different case. But that those statements by Hanlon, she leaves and then the actual confession comes sometime later in the discussion when she's not even in the room. That's right. She leaves with a parting shot of something along the lines of your girlfriend will really thank you later, sarcastically. And then Detective Plourd comes in and continues this similar vein. In fact, it's Detective Plourd who says, that's your baby. She's pregnant with your baby. And he says, well, how do I get her out of here? And then he says, tell us what happened. And then gives a similar recitation to what Special Agent Hanlon did saying, you have to say that you did it, that you used her, that she didn't know and so forth. This was not a matter of just trying to gather evidence from a witness about another investigation of another suspect. This was clearly designed, as Special Agent Hanlon's comment that I was reading shows, to coerce him, to overbear his will. It ends with, what the heck are you thinking? What do you think Sheena expects from you? What do you think her children expect from you? They have nobody at home. This is not, look, if the facts are, you know, that she didn't know, just tell us that and, you know, probably be better for her. This is clearly designed to play on his emotion for his loved ones and to, and to overbear his will by, by, by making him feel guilty for the situation they were in. I see that I'm out of time, so unless there are any further questions. Thank you very much. Thank you.